IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDI YOUNG-ROACH, | ) | CASE NO.  1:20-CV-01853-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Brandi Young-Roach ("Plaintiff" or "Young-Roach"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.      PROCEDURAL HISTORY

In February 2018, Young-Roach filed an application for POD and DIB, alleging a disability onset date of December 1, 2017 and claiming she was disabled due to post-traumatic stress disorder; obsessive compulsive disorder; depression; anxiety; insulin dependent diabetes; hypertension; diabetic neuropathy (hands); arthritis; and psoriasis.  (Transcript ("Tr.") at 11, 162, 182.)  The application was denied initially and upon reconsideration, and Young-Roach requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 11.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On April 26, 2019, an ALJ held a hearing, during which Young-Roach, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*)  On June 14, 2019, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 11-28.)  The ALJ's decision became final on June 24, 2020, when the Appeals Council declined further review. (*Id.* at 1-7.)

On August 20, 2020, Young-Roach filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case. (Doc. Nos. 16, 20-21.)  Young-Roach raises the following issue:

> (1) Whether substantial evidence supports the ALJ's finding that Ms. Young-Roach is capable of performing past relevant work when the ALJ failed to conduct an adequate evaluation of the limitations resulting from Ms. Young-Roach's severe physical impairments.

(Doc. No. 16 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Young-Roach was born in May 1977 and was 41 years-old at the time of her administrative hearing (Tr. 11, 27), making her a "younger" person under Social Security regulations.  20 C.F.R. §§ 404.1563(c).  She has at least a high school education and is able to communicate in English.  (Tr. 27.) She has past relevant work as a licensed practical nurse, industrial truck operator, and reservations clerk. (*Id.* at 26-27.)

2

**B.     Relevant Medical Evidence[2]**

On May 1, 2017, Young-Roach saw Maria Antonelli, M.D., for a rheumatology consultation regarding joint pain.  (Tr. 437.)  Young-Roach reported a history of psoriasis, which was "[f]airly well controlled," neck popping, pain in her knees and hands but no swelling, neck stiffness, and shoulder soreness.  (*Id.*)  Young-Roach reported worse joint pains with being more sedentary.  (*Id.*)  Young-Roach denied waking at night with pain.  (*Id.*)  She further reported worsening knee pain after walking for a long time.  (*Id.*)  Young-Roach also complained of numbness and tingling in her hands, which she attributed to her diabetes.  (*Id.*)  On examination, Dr. Antonelli found normal extremities, normal muscle tone and strength, normal gait, full range of motion, no synovial thickening, swelling, warmth, or tenderness in the hands, and normal grip strength.  (*Id.* at 438.)  Dr. Antonelli determined that the pain seemed inconsistent with PsA and instead seemed like chondromalacia and neck strain from her computer use and lack of exercise.  (*Id.* at 439.)  Dr. Antonelli recommended imaging of the cervical spine, physical therapy, and Motrin as needed.  (*Id.*)

A cervical spine x-ray taken that same day revealed loss of normal lordosis and mild degenerative changes from C4 through C6.  (*Id.* at 454.)

On August 7, 2017, Young-Roach saw Jolee Gregory, M.D., for an express care visit for pain and swelling in her right hand and arm that woke her up at night.  (*Id.* at 430.)  Young-Roach reported she started a new job working in a factory this year.  (*Id.*)  Young-Roach explained she had numbness in her right hand, but she had the most hand and arm pain when sleeping.  (*Id.*)  She stated she was now unable to use her right hand because of numbness and pain.  (*Id.*)  Young-Roach reported she had seen

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  In addition, as Young-Roach challenges only the ALJ's findings regarding her physical limitations, the Court's discussion of the evidence is further limited to her physical impairments.

Rheumatology, who had prescribed 100mg capsules of Neurontin, which Young-Roach had increased to 600mg on her own.  (*Id.*)  While she slept for five to six hours on the higher dose, she was still woken up with pain in her fingers on her right hand.  (*Id.*)  Young-Roach reported she had numbness off and on for a long time, but her symptoms had increased recently.  (*Id.*)  Young-Roach had attributed all symptoms to her diabetes.  (*Id.*)  On examination, Dr. Gregory found mild swelling of the right hand and fingers, no joint pain to palpation, painful right finger flexion and extension passively and actively, unable to make a fist, normal flexion and extension at the right, normal rotator cuff exam, and normal neurological exam. (*Id.* at 431.)  Dr. Gregory "[h]ighly suspect[ed] neuropathy" and thought "[v]ery possible Carpal tunnel syndrome."  (*Id.*)  Dr. Gregory referred Young-Roach to orthopedics and neurology.  (*Id.*)

On September 29, 2017, Young-Roach arrived at Marymount Hospital by EMS after being found unresponsive by her mother.  (*Id.* at 496.)  Young-Roach's blood sugar was 55.  (*Id.*). Young-Roach complained of pain in her hands that she described as constant, cold, burning, and numb and that was worse at night.  (*Id.*)  She reported taking Neurontin without improvement.  (*Id.*)  On examination, Young-Roach exhibited normal range of motion, no edema, tenderness, or deformity, normal coordination, and normal gait.  (*Id.* at 498.)  Treatment providers administered Tylenol, Reglan, and Benadryl for the pain in Young-Roach's hands, which helped, and discharged Young-Roach.  (*Id.*)  Treatment providers diagnosed Young-Roach with hypoglycemia and uncontrolled type 2 diabetes mellitus with hyperglycemia, with long-term current use of insulin.  (*Id.*)

On October 1, 2017, Young-Roach went to South Pointe Hospital complaining of pain and swelling to her left thumb.  (*Id.* at 493.)  Young-Roach reported she had noticed the pain and swelling after getting home from the hospital two days earlier and described decreased movement and sensation. (*Id.*)  An x-ray revealed a non-displaced fracture to the left thumb.  (*Id.* at 495.)  Treatment providers administered Tylenol, which helped.  (*Id.*)

4

On November 15, 2017, Young-Roach saw Erik Pioro, M.D., Ph.D., at the Neuromuscular Center of Cleveland Clinic for a consultation regarding her bilateral hand numbness.  (*Id.* at 370.)  Young-Roach reported a worsening of the numbness, tingling and throbbing pain in her hands that she rated as a 7/10 on average but that could range from an 8/10 to 10/10.  (*Id.*)  She stated her symptoms made it difficult to hold objects, and she had some clumsiness and dropping of grasped objects.  (*Id.*)  However, she could brush her hair and teeth without difficulty and could "easily" button shirts and use zippers.  (*Id.*)  Cold weather aggravated her symptoms.  (*Id.*)  On examination, Dr. Pioro found normal extremities, normal tone, normal strength, normal perception of light touch, pinprick, temperature, vibration, and proprioception except for "patchy loss in the hands bilaterally," intact rapid alternating movements bilaterally, normal gait, and negative Romberg's sign.  (*Id.* at 372-74.)  Dr. Pioro suspected "atypical presentation of a peripheral neuropathy vs other musculoskeletal etiology clinically manifested by bilateral hand numbness/tingling in the setting of inadequately controlled DM."  (*Id.* at 374.)  Dr. Pioro recommended Young-Roach undergo an EMG study.  (*Id.*)

On November 20, 2017, Young-Roach saw Mario Skugor, M.D., for follow up regarding her Type 1 diabetes.  (*Id.* at 486.)  Dr. Skugor noted Young-Roach had passed out twice at work, the most recent time three weeks ago, she had been on an insulin pump at one time but stopped because it made her gain weight, and she ate only once or twice a day.  (*Id.* at 488.)  Young-Roach reported poor energy, good sleep, stable weight with effort, feeling cold a lot, and painful neuropathy.  (*Id.*)  On examination, Dr. Skugor found no edema or deformities.  (*Id.*)  Dr. Skugor diagnosed Young-Roach with poorly controlled Type 1 diabetes and noted Young-Roach was willing to do MDI with carb counting.  (*Id.*)  Dr. Skugor prescribed 30 units of Lantus before sleep and one unit of Humalog per one carb.  (*Id.*)  Young-Roach was to email her home glucose levels to Dr. Skugor every week and he would adjust the regimen until Young-Roach had good control of her diabetes.  (*Id.*)

5

On November 22, 2017, Young-Roach saw Scott Burg, D.O., for a rheumatology consultation. (*Id.* at 383.)  Young-Roach reported thumb swelling for the past six weeks, as well as swelling of the right second MCP, and painful hands because of her peripheral neuropathy.  (*Id.*)  She also complained of morning stiffness that lasted for about five minutes.  (*Id.* at 384.)  On examination, Dr. Burg found no tender points, normal strength, bulk, and tone, full range of motion, swelling of the second MCP bilaterally, and swelling and slight tenderness of the IP joint of the left thumb.  (*Id.* at 388.)  Dr. Burg noted Young-Roach had cutaneous psoriasis, diabetic neuropathy, and an active synovitis of the MCP and IP joints.  (*Id.*)  At that time, Dr. Burg could not determine whether Young-Roach's "low grade oligo arthritis [was] related to psoriasis or another entity" but felt she would benefit from further evaluation. (*Id.* at 389.)

On December 19, 2017, Young-Roach saw William Camp, Jr., M.D., for follow up regarding her psoriasis.  (*Id.* at 417.)  Young-Roach reported she had been off Humira for a month and had noticed recurrence of psoriasis on her scalp.  (*Id.*)  While she had restarted her treatment, she had not yet noticed improvement.  (*Id.*)  Young-Roach reported she had recently been diagnosed with rheumatoid arthritis, but she had not noticed an improvement with Humira.  (*Id.*)  On examination, Dr. Camp found normal extremities, diffuse flaky white scales on the scalp, and a few erythematosus scaley papules on the torso. (*Id.* at 419.)  Dr. Camp diagnosed Young-Roach with plaque psoriasis and "scalp psoriasis with associated 'arthritis'" and directed Young-Roach to continue Humira once every two weeks.  (*Id.* at 420.)

On March 2, 2018, Young-Roach saw Dr. Burg for follow up.  (*Id.* at 597.)  Young-Roach reported she had no joint complaints while on Neurontin and denied joint swelling and erythema.  (*Id.*)  Young-Roach rated her pain as a 7/10.  (*Id.*)  On examination, Dr. Burg found no tender points, normal strength, bulk, and tone, and slight thickening of the left first IP joint.  (*Id.* at 599.)  Dr. Burg noted Young-Roach

had cutaneous psoriasis and osteoarthritis, and there was no evidence of an active PSA at that time.  (*Id.* at 601.)  Dr. Burg recommended follow up on an as needed basis.  (*Id.*)

On March 12, 2018, Young-Roach saw Dr. Skugor for follow up of her Type 1 diabetes.  (*Id.* at 594.)  Dr. Skugor again noted Young-Roach was willing to do MDI with carb counting.  (*Id.* at 597.)  Dr. Skugor again prescribed 36 units of Lantus before sleep and one unit of Humalog per one carb.  (*Id.*)

On March 12, 2018, Young-Roach underwent an EMG study, which revealed severe right carpal tunnel syndrome, moderate left carpal tunnel syndrome, and no evidence of a cervical radiculopathy.  (*Id.* at 547-48.)

On March 21, 2018, Young-Roach saw Payam Soltanzadeh, M.D., for hand numbness.  (*Id.* at 591.)  Young-Roach complained of numbness at the fingertips of both hands, although the right hand felt worse.  (*Id.*)  Young-Roach reported she took 300mg of Gabapentin three times a day, as 100mg was not effective.  (*Id.*)  On examination, Dr. Soltanzadeh found normal tone, normal strength, normal ability to stand from a chair with crossed arms, intact pinprick sensation on the feet "but in general unreliable," intact proprioception, negative Romberg's sign, and normal gait.  (*Id.* at 592-93.)  Dr. Soltanzadeh recommended better control of Young-Roach's diabetes and high LDL through more exercise and watching her diet, referral to a hand surgeon to consider carpal tunnel release surgery, and a cervical MRI.  (*Id.* at 593.)  Dr. Soltanzadeh noted Young-Roach did not want physical therapy for her neck yet.  (*Id.*)

A March 28, 2018 cervical spine MRI revealed minimal multi-level degenerative disc changes.  (*Id.* at 603.)

On August 22, 2018, Young-Roach saw Carla Harwell, M.D., to establish care.  (*Id.* at 727.)  On examination, Dr. Harwell found no edema of the extremities.  (*Id.* at 728.)  Dr. Harwell determined Young-Roach's hypertension and neuropathy were stable.  (*Id.* at 729.)

7

On September 24, 2018, Young-Roach saw Dr. Skugor for follow up regarding her Type 1 diabetes.  (*Id.* at 707.)  On examination, Dr. Skugor found no edema or deformities.  (*Id.* at 710.)  Dr. Skugor noted Young-Roach had lost 21 pounds since her last visit and was using Topamax, which had been prescribed by her primary care physician.  (*Id.*)

On October 22, 2018, Young-Roach saw Dr. Hartwell for follow up and complained of a productive cough.  (*Id.* at 731.)  Young-Roach reported two of her children had strep.  (*Id.*)  Dr. Hartwell noted Young-Roach did not need assistance with standing, sitting, or walking, and she did not use an assistive device.  (*Id.*)  On examination, Dr. Hartwell found no edema.  (*Id.* at 734.)

On November 19, 2018, Young- Roach saw Dr. Harwell complaining of fluid in her right elbow.  (*Id.* at 736.)  Young-Roach reported she had fallen after tripping over her children's toy.  (*Id.*)  Dr. Hartwell noted Young-Roach did not need assistance with standing, sitting, or walking, and she did not use an assistive device.  (*Id.*)  On examination, Dr. Harwell found fluid in the right elbow with erythema but no warmth or tenderness, and no edema of the extremities.  (*Id.* at 738.)  Dr. Harwell diagnosed Young-Roach with right tennis elbow.  (*Id.* at 739.)

On January 16, 2019, Young-Roach saw Elizabeth Kirchner, APRN, CNP, for follow up regarding her psoriasis.  (*Id.* at 748.)  Young-Roach reported having to switch from Humira to Otezla because of insurance issues, and since that time her joints had gotten worse.  (*Id.* at 749.)  Her right elbow resolved on its own, although it took a long time, since her doctor would not aspirate it because of her diabetes. (*Id.*)  Young-Roach also complained of left shoulder and bilateral knee pain.  (*Id.*)  Young-Roach reported her primary care physician had started her on 800mg of Ibuprofen, which did not help at all.  (*Id.*)  On examination, Kirchner found tenderness in the left shoulder, cool effusion to the left knee, boggy right elbow, normal gait, good motor strength, and intact sensation.  (*Id.* at 750.)  Kirchner determined Young-Roach's psoriasis was under good control on Otezla but noted the timing of arthritis was "suspicious for

8

unmasking of inflammatory arthritis" since the symptoms started after switching from Humira to Otezla. (*Id.*)  Kirchner noted Young-Roach was not responding to NSAIDs, so they would try COX-2.  (*Id.*) Because of her diabetes, Young-Roach was not a good candidate for steroids.  (*Id.*)

On January 31, 2019, Young-Roach saw John Morren, M.D., for a consultation regarding median nerve entrapment.  (*Id.* at 755.)  Young-Roach reported she had not followed up with a hand surgeon regarding release surgery because she was concerned that she would develop an infection as a complication of poorly controlled diabetes.  (*Id.*)  Dr. Morren noted her symptoms had remained "fairly stable."  (*Id.*)  Young-Roach reported she was still experiencing burning paresthesia of both hands that she rated on average as a 6/10 but that ranged from a 2/10 to an 8-9/10.  (*Id.*)  Cold temperature aggravated her symptoms, while Gabapentin helped with her pain.  (*Id.*)  Young-Roach denied frank weakness or dropping things, although she reported her right hand sometimes gave out.  (*Id.*)  Young-Roach also complained of arthralgia in her large joints, particularly her left shoulder, dry mouth, and occasional loss of bladder control.  (*Id.*)  On examination, Dr. Morren found reduced neck flexion to the left, normal extremities, no atrophy or abnormal movements, normal tone, no pronator drift or scapular winging, normal strength except for thumb abduction with APB on the right, which was 4/5, no difficulty squatting, negative Gower's sign, able to rise from a chair without using arms, absent patellar reflexes, diminished perception of pinprick and temperature in a proximal to distal gradient in the bilateral lower extremities and digits 2 and 3 of the upper extremities bilaterally, diminished vibration perception in the bilateral lower extremities, positive Phalen's test bilaterally, worse on the right, and normal gait.  (*Id.* at 758-60.) Dr. Morren noted:

> On exam, it does appear that patient has progressed to develop mild weakness in her R APB.  Additionally, her sensory exam suggests that she also has sensory neuropathy, likely due to a long-standing history of DM.  Her painful paresthesia is responding well to her current regimen of Gabapentin 900 mg tid.  She remains reluctant to even see hand surgery for median nerve release at this time and has

9

> been counseled on progressive irreversible nerve damage *as a potential result of deferring surgery.*  She is however agreeable to wearing cockup splints at night.

(*Id.* at 760) (emphasis in original).

On February 13, 2019, Young-Roach saw Pratibha Rao, M.D., for follow up after she ran out of Lantus, one of her diabetes medications.  (*Id.* at 777.)   Lab work revealed an A1C level of 8.5% and a glucose level of 393.  (*Id.* at 778.)  On examination, Dr. Rao found weight loss of 21 pounds, no edema or deformities, no focal signs, and no tremors.  (*Id.* at 780-81.)  Dr. Rao noted they discussed the ill effects of poorly controlled diabetes, of which Young-Roach was aware.  (*Id.* at 781.)

A month later, Dr. Rao reviewed Young-Roach's glucose meter download.  (*Id.* at 804.)   All values were in the 300s, 400s, and 500s.  (*Id.*)  When Dr. Rao called Young-Roach, Young-Roach told Dr. Rao she was busy with four children, took Gabapentin at night which "knock[ed] her out," and woke up at noon.  (*Id.*)  Dr. Rao adjusted Young-Roach's diabetes medication and directed Young-Roach to schedule a visit in two weeks for her to bring her glucose meter for download.  (*Id.*)

On October 2, 2019, Young-Roach saw Dr. Hartwell for follow up of her "usual neck pain."  (*Id.* at 816.)  Young-Roach also complained of intermittent epigastric pain.  (*Id.*)  Young-Roach reported a bad episode of epigastric pain one night but told Dr. Hartwell she decided not to go to the ER.  (*Id.*)  Young-Roach also asked for a referral to the Pain Clinic.  (*Id.*)  Dr. Hartwell noted Young-Roach did not need assistance with standing, sitting, or walking, and she did not use an assistive device.  (*Id.*)  On examination, Dr. Hartwell found no edema.  (*Id.* at 819.)  Dr. Hartwell diagnosed Young-Roach with fibromyalgia and referred her to the Pain Clinic as she requested.  (*Id.*)  Dr. Hartwell told Young-Roach she needed to be evaluated if chest pain happened again.  (*Id.*)

10

**C.**     **State Agency Reports**

On April 7, 2018, Gail Mutchler, M.D., reviewed the file and opined Young-Roach could lift 20 pounds occasionally and 10 pounds frequently, stand/walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 173, 175.)  Dr. Mutchler further opined Young-Roach could frequently push and pull with hand and foot controls.  (*Id.* at 173.)  Young-Roach should not climb ladders, ropes, or scaffolds, but could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  (*Id.*)  Young-Roach could occasionally handle, finger, and feel with the right hand and frequently handle, finger, and feel with the left.  (*Id.* at 174.)  Young-Roach must avoid all exposure to hazards.  (*Id.* at 175.)

On July 10, 2018, Anne Prosperi, D.O., affirmed Dr. Mutchler's findings on reconsideration.  (*Id.* at 190-192.)

**D.**     **Hearing Testimony**

During the April 26, 2019 hearing, Young-Roach testified to the following:

- She lives with her husband and her four children.  (*Id.* at 127.)  Her youngest child is four and a half, and her oldest child is 12 and a half.  (*Id.*)  She attended four years of college and was an LPN for 15 years.  (*Id.* at 127-28.)  She has a driver's license, and she drives.  (*Id.* at 128.)  She last worked in January 2018 after trying to work through a temp agency.  (*Id.* at 129.)  She passed out at work when her blood sugar was low and got sent home.  (*Id.*)

- She cannot work because she cannot stand for more than 30 minutes without pain and burning in her feet, and with her sugars being as high as they are, she has to constantly drink water and then run to the bathroom.  (*Id.* at 139.)  She cannot use her hands for more than two hours before taking a break because they are painful.  (*Id.*)  She would need to take an hour break.  (*Id.* at 148-49.)  She cannot tell when her blood sugars are high or low.  (*Id.* at 140.)  She takes Humalog and Lantus for her diabetes.  (*Id.*)  She takes Gabapentin three times a day for her burning feet and hands.  (*Id.*)  Gabapentin works enough to keep her from "screaming and crying with the pain," but her hands are "continuously numb and they burn because [her] nerves are damaged from [her] sugar."  (*Id.*)  She cannot control how high her blood sugar is.  (*Id.*)  Gabapentin has a "sleepy affect," but she does not want to be on Lyrica or Percocet because she has four children and must be awake and alert.  (*Id.*)  She wears

11

braces on her hands at night, but they do not really help.  (*Id.* at 141.)  If the feeling gets worse, she needs to have surgery, but she has to be cleared by her endocrinologist because her healing time is not good as a diabetic.  (*Id.*)  She was told her right hand was worse than her left, but she does not use her left hand.  (*Id.* at 141-42.)  She has no trouble sitting.  (*Id.* at 148.)  She would need to sit for an hour after standing for 30 minutes before she could stand again, and she would be able to stand for less time after that.  (*Id.*)  Her pain does not interfere with her ability to concentrate.  (*Id.* at 149.)

- Her husband does the shopping and puts food in the oven.  (*Id.* at 143.)  Her oldest does the laundry and the dishes.  (*Id.* at 144.)  Her nine-year-old sweeps and takes out the trash.  (*Id.*)  She takes care of herself, she showers, she takes her medication, and she bathes and dresses and takes care of her four-year-old child.  (*Id.*)  She does homework and reading with her children.  (*Id.*)

- On an average day, she wakes up and takes her children to school.  (*Id.* at 145.)  She then goes back home with her four-year-old daughter.  (*Id.*)  She usually takes her to her daughter's godmother's house to help her daughter prepare for her kindergarten screening in May.  (*Id.*)  She then picks up her children from school and helps them with their homework.  (*Id.* at 146.)  Her husband puts dinner in the oven.  (*Id.*)  They sit down and have dinner, then the dishes must be washed.  (*Id.*)  The nine-year-old takes the laundry out of the dryer, the children fold the clothes, and put their clothes away.  (*Id.*)  Then the children need to bathe and get ready for school the next day.  (*Id.*)

The VE testified Young-Roach had past work as a licensed practical nurse, industrial truck operator, and reservation clerk.  (*Id.* at 153-54.)  The ALJ then posed the following hypothetical question:

> [F]or the first hypothetical I'm going to pose, I'm going to ask if you can please assume an individual Claimant's age, education and work experience and if you can please assume that this individual can perform the full range of light work with the following additional limitations: He or she can frequently operate bilateral hand and foot controls; frequently climb ramps and stairs; never climb ladders, ropes and scaffolds; frequently balance, stoop, kneel, crouch and crawl; frequently perform bilateral handing [sic], fingering and feeling; never be exposed to hazards such as unprotected heights and dangerous machinery.  This hypothetical individual cannot work at a production-rate pace and is limited to routine workplace changes.  With these limitations, can you please advise if such an individual can perform Claimant's past work?

(*Id.* at 154-55.)

The VE testified the hypothetical individual would be able to perform Young-Roach's past work as a reservation clerk.  (*Id.* at 155.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as housekeeping cleaner, cashier, and information clerk.  (*Id.* at 156.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is

13

presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Young-Roach was insured on her alleged disability onset date, December 1, 2017, and remains insured through December 31, 2022, her date last insured ("DLI"). (*Id.* at 11-12.) Therefore, in order to be entitled to POD and DIB, Young-Roach must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.  The claimant has not engaged in substantial gainful activity since December 1, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: diabetes mellitus, essential hypertension, peripheral neuropathy, other disorder of the skin and subcutaneous tissues (psoriasis), osteoarthritis and allied disorders, carpal tunnel syndrome, degenerative disc disease of the cervical spine, depressive, bipolar, and related disorders  (major depressive disorder), anxiety and obsessive-compulsive disorders (anxiety disorder and panic disorder), and trauma and stressor related disorders (posttraumatic stress disorder) (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

14

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except frequently operate bilateral hand and foot controls; frequently climb ramps and stairs, never climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; frequently perform bilateral handling, fingering, and feeling; never be exposed to hazards, such as unprotected heights and dangerous machinery; cannot work at a production rate pace; limited to routine workplace changes.

6.    The claimant is capable of performing past relevant work as a reservations clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2017, through the date of this decision.

(Tr. 13-28.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

15

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734,

2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In her sole issue on appeal, Young-Roach questions whether substantial evidence supports the ALJ's finding that she could perform past relevant work.  (Doc. No. 16 at 12.)  Young-Roach asserts two arguments: (1) The ALJ "unreasonably" determined the objective evidence did not "fully corroborate" her allegations regarding her symptoms; and (2) the ALJ's finding that she could frequently handle, finger, and feel with her right upper extremity lacked substantial evidence.  (Doc. No. 16 at 13, 15.)  Young-Roach attacks the reasons the ALJ gave in finding Young-Roach's statements "not entirely consistent with the objective medical evidence and other relevant evidence" in the record.  (*Id.*)  Young-Roach asserts that "[t]he ALJ's inadequate evaluation of [her] symptoms and resulting limitations has resulted in a wrongful denial of benefits," and that she "should have been limited to a range of sedentary work with only occasional handling, fingering, and feeling with the right upper extremity." (*Id.* at 16.)

The Commissioner responds that substantial evidence supports the ALJ's physical RFC determination, as well as the ALJ's evaluation of Young-Roach's subjective symptoms.  (Doc. No. 20 at 7, 15.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a

claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered*.  See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical

18

reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[4] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human*

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the April 26, 2019 hearing.
[4] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

*Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[5]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Young-Roach's testimony and other statements regarding her symptoms and limitations.  (Tr. 18.)  The ALJ determined Young-Roach's medically determinable

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

impairments could reasonably be expected to cause the alleged symptoms.  (*Id.*)  However, the ALJ found

her statements concerning the intensity, persistence, and limiting effects of these symptoms were not

entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the

decision.  (*Id.*)  Specifically, after reviewing the relevant medical evidence, the ALJ found:

> As shown above, the claimant experiences joint tenderness and swelling, reduced
> neck flexion, decreased sensation and reflexes, occasionally decreased right thumb
> strength, elevated blood pressure levels, low and high blood sugar levels, and
> occasional skin abnormalities as a result of uncontrolled diabetes mellitus,
> peripheral neuropathy, osteoarthritis, degenerative disc disease of the cervical spine,
> carpal tunnel syndrome, hypertension, and psoriasis (Exhibit 1F, 2F, 3F, 4F, 6F, 9F,
> 12F, 13F, 14F, 15F, 16F, 17F).  This evidence indicates the claimant would have
> difficulty with particular activities, including lifting and carrying, and prolonged
> standing, walking, and sitting, thereby confirming a limitation to work at the light
> exertional level, where she is expected to lift and carry 20 pounds occasionally and
> 10 pounds frequently, and stand, walk, and sit for up to 6 hours in an 8-hour
> workday.   The claimant has reported greater functional limitations (Hearing
> Testimony); however, the record is absent sufficient objective evidence to support
> her allegations, as examinations have revealed otherwise full range of motion and
> strength, normal heart and lungs, normal coordination, normal extremities without
> edema, and a normal gait with independent ambulation (Exhibit 1F, 2F, 3F, 4F, 6F,
> 9F, 12F, 13F, 14F, 15F, 16F, 17F).  Thus, the claimant retains sufficient residual
> functional capacity to perform the reduced exertional requirements of light work.
>
> However, given the evidence of tenderness and swelling of the hand and finger
> joints, occasional left knee effusion, decreased upper and lower extremity sensation
> and reflexes, and occasional difficulty making a fist with the right hand, the
> undersigned limits the claimant to frequent operation of bilateral hand and foot
> controls, and frequent bilateral handling, fingering, and feeling (*Id.*).  In light of the
> evidence of decreased range of motion of the neck, joint tenderness and swelling,
> decreased sensation and reflexes, uncontrolled blood sugar levels, and occasionally
> elevated blood pressure levels, it is reasonable that certain postural maneuvers
> would pose difficulty if performed constantly (*Id.*).  Therefore, the claimant can
> frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, and
> never climb ladders, ropes, or scaffolds.  Given these abnormalities on examination
> and laboratory testing, the claimant can also never be exposed to hazards, such as
> unprotected heights and dangerous machinery.
>
> * * *
>
> In addition to the medical evidence, I have also considered other factors in
> evaluating the claimant's statements concerning the intensity, persistence, duration,

21

and limiting effects of her severe medically determinable impairments, including the claimant's daily activities and the claimant's history of treatment.  However, these factors do not show that the claimant is more limited than determined when setting forth the above residual functional capacity.

The claimant's activities of daily living detract from her allegations of totally debilitating impairment, and instead support the foregoing residual functional capacity.  The claimant has indicated limited activities, as her husband does the cooking with the stove and oven, her child does the laundry, and she reportedly does not have any interests (Exhibit 8F, Hearing Testimony).  However, the claimant is able to care for her children, which includes one young residual child at home with her during the day, is able to dress and bathe herself, shop, manage money independently, play with her children, and drive her children to and from school (*Id.*).  In March 2018, the claimant indicated she is able to care for most activities of daily living without assistance, and despite her testimonial allegations to the contrary, the claimant admitted she is able to do laundry and cook (*Id.*). In addition, the claimant performed some work activity as a cashier following the alleged onset date (Exhibit 4E, 5D, 7D, 8D).  Thus, the claimant's activities, while perhaps somewhat restricted, confirm she is not as limited, either physically or mentally, as she has alleged.

In assessing the claimant's allegations, the undersigned has considered the scope of treatment.  The claimant's physical conditions have been treated relatively conservatively, with various medications, including increasing doses of insulin, and bilateral cockup splints, prescribed by the claimant's various medical providers (Exhibit 1F, 2F, 3F, 4F, 6F, 9F, 12F, 13F, 14F, 15F, 16F, 17F).  The claimant has remained symptomatic, thereby confirming a need for continued medication and treatment (*Id.*).  However, the claimant has admitted some improvement with use of medication, including gabapentin, and she has been resistant to more extensive treatment modalities, such as use of an insulin pump or carpal tunnel release surgery (*Id.*).  Although the claimant's diabetes remains poorly controlled, she has not required emergency hospitalization for episodes of hypoglycemia since late 2017, and the record is absent indications of diabetic ketoacidosis or complications such as diabetic retinopathy or nephropathy (*Id.*).  This evidence confirms the claimant's physical conditions, while severe, are manageable with relatively conservative medical treatment.

(Tr. 22-24.)

The Court finds substantial evidence supports the ALJ's assessment of Young-Roach's subjective complaints.  The record evidence, as noted by the ALJ, is not entirely consistent with Young-Roach's allegations of disabling conditions.  (*Id.* at 17-26.)  The ALJ considered evidence regarding several of the

22

regulatory factors.  (*Id.*)  The ALJ also properly considered Young-Roach's ability to work part-time throughout a part of the adjudicated period in evaluating Young-Roach's subjective symptoms.  *Miner v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1529(c)(3), 404.1571)).  The ALJ's discussion of the relevant medical evidence included several findings that undercut a finding of disability, including full upper extremity strength, with the exception of right thumb weakness, in January 2019.  (Tr. 17-26.)

Furthermore, Young-Roach points to no contrary lines of evidence the ALJ ignored or overlooked. While Young-Roach makes much of how the ALJ did not find the state agency reviewing physicians' opinions inconsistent with the EMG study, the ALJ mentioned the EMG study in her discussion of the relevant evidence and identified other record evidence that undercut the state agency reviewing physicians' manipulative limitations.  (*Id.* at 20, 25.)  It is not for the Court to weigh the evidence or resolve conflicts in the evidence.  The Court notes Young-Roach does not challenge the weight assigned to the state agency reviewing physicians' opinions.[6]

The ALJ referenced Young-Roach's allegations and then contrasted them with the medical evidence, including examination findings, as well as the opinion evidence.  (*Id.* at 17-26.)  Reading the decision as a whole, it is clear why the ALJ did not accept the entirety of Young-Roach's allegations.  *See*

---

[6] Rather, in three sentences, Young-Roach states the ALJ rejected the state agency reviewing physicians' opinions regarding her manipulative limitations, finding them inconsistent with the record evidence, although they were not inconsistent with the EMG study; instead, the ALJ found them inconsistent with two other exhibits and hearing testimony.  (Doc. No. 16 at 14.)  Young-Roach makes no specific argument regarding the ALJ's assessment of these opinions.  Therefore, the Court finds any such argument waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.'") (citations omitted).  It is not for this Court to develop Young-Roach's argument for her.  As mentioned above, it is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and she did so here.

SSR 16-3p, 2016 WL 1119029 (the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."). The Court is able to trace the path of the ALJ's reasoning regarding the ALJ's subjective symptom analysis. Therefore, the Court find no error in the ALJ's subjective symptom analysis.

Although Young-Roach cites evidence from the record she believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). The ALJ clearly articulated her reasons for finding Young-Roach capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence. There is no error.

To the extent Young-Roach argues the ALJ erred because the RFC is not supported by a medical opinion, the Sixth Circuit has specifically rejected such an argument, finding "the Commissioner has final responsibility for determining an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. Apr. 30, 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a

24

physician offers an opinion consistent with that of the ALJ."); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-443 (6th Cir. Sept. 26, 2017).

**VI.    CONCLUSION**

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: October 5, 2021                                   *s/ Jonathan Greenberg*
                                                        Jonathan D. Greenberg
                                                        United States Magistrate Judge